**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 00-6065-CR-DIMITROULEAS**

UNITED STATES OF AMERICA,

    Plaintiff,

Vs.

FITZROY MANDERSON,

    Defendant,
_____/

FILED by __ D.C.
JUN 16 2000
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## MOTION TO SUPPRESS WITNESS IDENTIFICATION OUT-OF-COURT- AND IN-COURT

COMES NOW, the Defendant, FITZROY MANDERSON, by and through his undersigned counsel, and respectfully moves this Court to Suppress and otherwise exclude from evidence the out-of-court identification and the in-court identification made of the Defendant, FITZROY MANDERSON, by the Government's witness, Jose Rodriguez. Since such identification was made under terms and conditions which were unduly suggestive toward the witness identifying the Defendant, and were otherwise violative of the Due Process Rights guaranteed under U.S. Const. Amend. IVX, and in support thereof states and alleges as follows

### FACTUAL BASIS

On or about May 20, 2000 at 10:15 a.m., the Defendant who was at all times material hereto a staff member aboard the M/V Costa Victoria, owned and operated by Costa Cruise Line, disembarked from his vessel and proceeded through a security check point at the at the gang plank of the M/V Costa Romantica which were docked next to one another in Port Everglades, Broward County, Florida. According to depositions



taken pursuant to a Motion to Perpetuate Testimony, it was standard practice for coastal cruise line personnel who traveled onto a ship to surrender their identification to security staff at the opening of the gangway and be issued a temporary visitors pass. Testimony of government witnesses, since depositions have already been taken, specifically of Dilbahadur Chhetri and Rajesh Said indicate that the Defendant traveled onto the vessel. Subsequently, the same government witnesses testified that the Defendant then attempted to exit the ship while numerous other crewmembers were trying to exit. The Defendant was stopped by another security agent Guzman at the entry to the gangway and was detained while questions were asked of him. The testimony was then that the Defendant turned around and began to run past the initial checkpoint down the hallway of the ship toward the stern at a time when Guzman is calling out to him, "stop" The testimony then indicated that ship personnel lost sight of the Defendant until a short time later when a member of housekeeping, Jose Rodriguez, then saw activity in the hallway of the ship. It is this testimony which the Defendant seeks to exclude from evidence at the time of trial

Rodriguez testified that at approximately 9:30 a.m. he was cleaning a room on board the M/V Costa Romantica. He left the room in order to change the towels in the bathroom (Depo: 8: 19-21). He noticed a man who was standing in the hallway which he described as a black gentleman wearing blue jeans and a long T-shirt of unknown color (Depo: 8: 11-15) The witness identified the Defendant who was present for the video tape deposition on May 1, 2000. The witness indicated that he was approximately 7 to 10 meters away when he made the observation, and that no one was present in the hallway. (Depo 10: 1-11). The witness indicated that the gentleman was seen in the hallway for

approximately one (1) minute. (Depo: 11-12). The witness approached the trashcan in the hallway, lifted the trashcan twice and deposited (Depo: 12: 4-8 and page 13: 15-19). The deposits occurred at a time when the individuals back was to the witness and the witness observed the individual lifting the long T-shirt up and producing something that appeared to be taken from a place that was concealed underneath the shirt. He did not see what was placed into the trashcan (Depo: 14: 12-16).

The witness apparently had the opportunity to see the individual at a time when the gentleman was "looking all around." (Depo: 12-13). The witness also described the actions of the Defendant as: "he was just looking around. He simply looked around and looked around and did it twice and he left." The witness went on to explain that. "I only saw him up to this point because he left – he exited through the same door and then from there I couldn't see him because he wasn't in the hallway anymore." (Depo: 14-15).

The witness then approached the trashcan, lifted the lid, and saw a small piece of paper on top. He moved the paper and he looked in which he described to be the same color as those that had been produced at the time of the deposition. There were actually four (4) packages that were later retrieved by law enforcement from the trash receptacle. The witness then notified a ship officer, and the officer then responded to the trash receptacle and dumped out it's contents and then notified law enforcement.

### CROSS-EXAMINATION OF WITNESS RODRIGUEZ

On cross-examination the Government's witness, Rodriguez, indicated that he had met the Defendant previously on the M/V Victoria. At that time the Defendant was working in the galley. He explained that he had been working with the officers in the dining room. Because of his position, it was necessary for him to go to the kitchen in

order for him to get supplies to take back down while on the M/V Victoria (the vessel to which Manderson was assigned). The witness then testified that he had given a general description of the individual he had seen in the hallway, but that he had not told law enforcement that he knew the man and recognized him as an employee of the M/V Victoria. (Depo. 27: 9-25). When questioned further on this point, Rodriguez explained that he did not identify the person that he had seen in the hallway to authorities as a man that he knew to be an employee of the sister ship because:

> "No. Before, no. It is now that I recall that I had seen him before aboard the Victoria ship"
>
> "At that moment, I did not recall that because he was not right across from me." (Depo 29: 8-13).

The witness upon being pressed to give a further explanation stated that, "he did not recognize him at the time when he had seen him in the hallway because "I did not have daily contact with him. I just saw him a couple of times because I have to go up there for food." (Depo. 30: 20-23). The total number of times that Rodriguez had seen the Defendant prior to identifying him at the time of the deposition was, "there [aboard the M/V Victoria] on several occasions, within the kitchen itself, but there were a lot of people there " (Depo 35: 16-18). As an estimate, the witness stated that he had seen him, "three or four times a week, but it would depend." (Depo. 36. 9-13).

After reporting what he had seen, the witness, Rodriguez, then began to exercise by running around the ship. He was informed by the Second Commander that law enforcement agents needed to speak with him. (Depo: 36. 19-24). During the course of the deposition, the witness identified Broward Sheriffs Office Detective Cunneen as the

individual who approached him for making a visual identification of the individual they had in custody. (Manderson) (Depo: 37: 11-25).

Before making the identification, since the witness did not speak English, he was told via the Second Commander (who spoke to him in Spanish), that "they have someone prisoner and they need you to – they have someone arrested and they need you to go ahead and identify if this is the person sticking the stuff in the trash." (Depo: 37: 19-25 and page 38: 1). Rodriguez then testified that when he was advised that someone was in custody, and the Defendant was being asked for identification, Rodriguez stated, that the individual,

> "...he came out. They took him out to the door so that I could go ahead q and look at him."
>
> Question: So they showed you one individual?
>
> Answer: Yes.
>
> Question: And he was in custody?
>
> Answer: Yes.
>
> Question: And you knew that because he was handcuffed, true?
>
> Answer: Well yes, I understand that because I mean when they have someone like that, it is because they are suspicious about them for something." (Depo: 40: 1-14).

## **MEMORANDUM OF LAW AND SUPPORT**

In <u>Manson vs. Brathwaite,</u> 432 U.S. 98 (1977), the court delineated standards for use in a Motion to Suppress due to suggestive Pre-Trial identification. The court held that, "reliability is the linchpin" in determining the admissibility of identification testimony, and applied the "totality of the circumstances" standards of <u>Stovall vs. Denno,</u>

388 U.S. 293 (1967). In order to determine the reliability of factors to be weighed the Stovall court found that the factors to be weighed were:

> 1. The opportunity of the witness to view the criminal at the time of the offense;
> 2. The witness' degree of intention;
> 3. The accuracy of any prior description by the witness;
> 4. The level of certainty demonstrated by the confrontation;
> 5. The time between the occurrence of the crime and the confrontation.
> Manson, 432 U.S. @ 104

The court in Manson found that the identification procedure in that case was suggested because only one photograph was used and that this procedure was unnecessary because there were no exigent circumstances requiring a single photographing display, and, under the totality of the circumstances, there was not a substantial likelihood of irrefutable misidentification. In the instant case, the Defendant was shown to the only witness that had actually seen the individual who apparently deposited the packages of cocaine into the trashcan and was advised by a Spanish speaking officer that the police had an individual they suspected in custody, and that they needed him to confirm that this was the individual. At the time of the show-up, the witness was only shown one black male who was in custody (i.e. handcuffed) at the time of the identification.

The Eleventh Circuit has established a two-step test in determining whether identification procedures are unconstitutional. The first step is to determine whether the procedures used were unduly suggested. Blanco vs. Singletary, 943 F.2d 1477-1479 (11th Cir.) citing Dobbs vs. Kemp, 790 F.2d 1499, 1506 (11th Cir. 1986), modified in part on other grounds 809 F.2d 750 (11th Cir. cer. den.) 41 U.S. 1059 (1987). If so, the second step is to determine whether under the totality of the circumstances, the identification was

reliable. Blanco, Neil vs. Biggers, 409 U.S. 188 (1972); see also Cikora vs. Deggar, 840 F.2d 893, 895 (11th Cir. 1988).

In the instant case, there is nothing pointing to the overall accuracy of the identification of the Defendant while still onboard the vessel with the identification made of the Defendant at the time of the deposition. The witness had testified that he had seen the Defendant on a number of occasions as frequent as two to three times per week. He also testified that the Defendants overall characteristics had not changed since viewing the Defendant in 1997. If called to testify, the Defendant would also state that he knew the witness from playing soccer with him on a variety of occasions. Wherefore, there is nothing to suggest the overall reliability of the identification since the witness should have been able to identify him at a distance of up to ten meters (approximately 30 feet), when seeing him for a period of approximately only one minute. Despite that, the witness never testified that he recognized the individual that he saw by the trashcan at the time when he first viewed him or later when shown the Defendant while he was in custody.

WHEREFORE, the Defendant, FITZROY MANDERSON, respectfully requests that this court suppress and otherwise exclude the testimony of the government's witness, Jose Rodriguez at the time of trial and prevent any and all testimony from being introduced of the identification made either onboard the ship or during the course of the deposition that the Defendant was the individual seen by the trashcan.

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent hnad-delivery this  / /  day of June, 2000 to Assistant United States Attorney Terry Thompson.

HOWARD J. SCHUMACHER
One East Broward Boulevard
Suite 700
Ft. Lauderdale, FL 33301
(954) 356-0477
FL. Bar No: 776335